Our next case is Eli Lilly v. Hospira, 2018, 21-26, and 21-27, New York, New York, New Mr. Lyell. Did I get that right? You did, Your Honor. Good morning and may it please the court. I'll speak first about literal infringement and come back to infringement under the doctrine of equivalence later on. The district court erred in finding that Hospira literally infringes the 209 patents. It did so because it did not give the claims their plain and ordinary meaning. One question I have for you is if we were to affirm the court on the doctrine of equivalence, I can't tell if there's any reason we would then need to reach this question of literal infringement. Am I wrong about that? And I guess it would probably be vice versa, that you have to overcome both of these findings to prevail. Am I right? Well, I agree that in order for me to prevail, I have to win on both points. I do agree with that. But I don't see all of the same products are covered either way. So if I were to affirm on DOE, for example, I would never reach this literal infringement question. It would be not relevant. Well, that's true, but the reverse is also true. If we infringe literally, then you don't have to reach the doctrine of equivalence. I just wanted to make sure that I wasn't missing anything. Go ahead. You're not. As I said, the district court failed to give the claims their ordinary and plain meaning. There's a claim term, and I'm going to turn to the claim, and I invite you to do the same. It's on page 22 of the appendix. There's a claim term, administration of pemetrexid disodium, and that's the claim term where the district court went wrong. The claim is instructive. Then claim 12. Claim 12. And I'm focusing on claim 12 because it's the only independent claim that ASFIRO was found to have infringed. But the court said you can administer it as long as you find a relevant ratio in the solution of the sodium ions and the active ingredient. That is correct. But that's not the plain meaning of the claim. What the court did and where the court went wrong. That was not just a double check since these two cases, yours and the next one, are related. That construction was not relied on in the other case. There's no literal infringement found in the other case. That's correct. And the DOE was based on a construction that started with the compound together. That is correct. I like to start with the claim because the claim is a straightforward, simple claim that provides a recipe for practicing the method that's set out in the claim. Counsel, I want to interrupt you. Time is fleeting. I want to get to the equivalence issue. Yes, Your Honor. Why isn't it fairly clear that the surrender of subject matter was merely tangential to pemetrexid disodium? It cut back from antifolate to pemetrexid disodium and the particular salt was not the point. What makes the particular salt the point, Your Honor, is that again and again and again in the remarks that the prosecuting attorney made to the patent examiner, the point of differentiating the prior art is always the change in terminology from antifolate to pemetrexid disodium. So the problem that Lilly has in providing an explanation... But that way of putting it is, it seems to me, sort of exactly what the several exceptions that the Supreme Court set out near the end of Festo are designed to say, no, no, no, no, we are not going to say that the point of the change is everything that you chose to include in your new terminology. There are further inquiries. There's a foreseeability inquiry. Separately, there is a tangential relation inquiry and that really brings one to what the jury said, that the particular salt used was not the point or the reason for the amendment. But that's not quite the inquiry. Once the presumption arises, and Lilly agrees that the presumption arises based on the amendment that was made. Once the presumption of a prosecution history estoppel arises, then the burden is on Lilly to explain why, in this case, because we're only relying on the tangential exception. The burden is on them to explain why it's tangential. And there's another requirement, and this is the key requirement. I think what the Supreme Court said was only tangential or merely tangential. In other words, it was a side issue, the salt. Well, that's correct, but my point is a different point. My point is it's not just an explanation, but it has to be an explanation that was objectively apparent in the contemporaneous documents in the file history. And this is where the parties are at odds. They've offered an explanation. The explanation is they're changing the active moiety from metotrexate to hematrexate. And that's their explanation, but that's not what they told us. No, their explanation and what they told the PTO, and I'm going to quote, is to reduce the toxicity associated with the administration of permetrexed disodium. Unless I'm mistaken, and my understanding of this technology is probably not up to the par of everyone else on this panel, but my understanding of that is it's the permetrex that is what causes the toxicity. It's not the salt. In fact, you don't get it until it's disassociated. So why isn't that conveying to an ordinarily skilled artisan exactly that, what I'm going after is a cure or an improvement to the toxicity caused by the permetrex itself. The salt's not what causes it. So why isn't that, since that's the actual words that they used when they made this amendment, why isn't that explaining quite clearly to the whole world that it's the permetrex, not the salt, that is the reason for the change? Well, because I think the remarks are not consistent with it. The remarks that can be found in the appendix on page 429, they continue on for a few pages. The remarks and the explanation offered by the prosecuting attorney during prosecution are not consistent with that. And in fact, the change wasn't simply a change of moiety. The change was, instead of cutting back the scope of the claim to the moiety, the scope of the claim was cut back to a specific species of permetrex. And that species is permetrexid disodium. And again and again and again in the remarks... Well, it was a species of antifolate, right? Well, yes, it's a species of antifolate. So permetrexid would be a type of antifolate. And we're talking now about a species, a specific species of permetrexid. And the remarks again and again and again focus on permetrexid disodium. And I'm not going to read the whole thing, but if you look at the remarks section in the appendix, you will see again and again and again permetrexid disodium is not disclosed in the prior art. And that's why we are avoiding the prior art. Permetrexid disodium fixes the problem with the written description issue. Permetrexid disodium avoids arsenium. Permetrexid disodium avoids obviousness of amurium in view of John, et cetera, et cetera. And that is not consistent with the explanation that Lily is offering to justify application of the tangential exception. And it's the failure to find this objectively apparent. I'm sorry, but you seem to be avoiding all of the portions of the remarks that focus on the reason actually being the reduction of the toxicity. On page 7880, in response to every single rejection, in a very short paragraph, they explain that this is to reduce the toxicity associated with the administration of permetrex disodium. So I guess I'm confused because my understanding is a skilled artisan would know that it only happens when you have a disassociated product in the solution. So I am... Do the counter ions have anything to do with the reduction of toxicity when it's in the body? No, the counter ions do not, as far as I understand, Judge. But perhaps I'm not articulating this as well as I wish I could. But the point is not... The point is not the science in this particular instance. The point is squaring up the legal justification for invoking the exception with the statements that were made in the record. And I can't find, Judge Warren, I apologize.  7880. In the appendix? Yes. Different appendix? Oh, I'm looking at the other appendix. My bad. I'm looking at the appendix in the other case. Gee whiz. I don't have that. I can't find it right now. Here, you can come borrow mine. Mr. McQueen, do you have one you could lend him? 430. All right. Thank you. I'm so sorry. All right. Would you say it again, Your Honor? 7880. Sorry, I got your appendices mixed up. All right. So I'm on appendix 430. And is this language that you're looking at? Appendix 430? Which appendix 430? Well, I'm sorry, our appendix 430. I didn't bring Mr. O'Quinn's with me. At least not to the podium. That seems like a reasonable choice. The point is the anions make no difference to the toxicity. I agree that the anions make no difference to the toxicity. And so it's curious that the anions are so prominently referred to, the disodium is so prominently referred to. In fact, I can't find, at least in what I'm looking at, I can't find an example of where pemetrexid is referred to, not in any form except the disodium form in all the remarks that were submitted. Every single time, as far as I can tell, every single time pemetrexid disodium is, I'm sorry, pemetrexid is referenced, it's always referenced in the form of disodium. And that's not explained, and that's not consistent with the explanation that's being offered to invoke the exception. And if it's not objectively apparent, and I still haven't found the language that Judge Moore thinks makes it objectively apparent, but I'm finding all this other language that... In 430 of your appendix, in every single paragraph, it talks about the purpose of the amendment being to reduce the toxicity. Oh, I see what Your Honor is saying. But it's saying that it's pemetrexid disodium that does that. Yes, but a skilled artisan knows it's the pemetrexid. It's not the disodium. So you're right. A skilled artisan would read that and say it's the disassociated form in which it's going to reduce the toxicity. But a skilled artisan would also read this prosecution and understand that pemetrexid disodium does not include pemetrexid tromethamine, for example, and would understand that prosecution history estoppel would prevent Lilly from making this kind of distinction, making these sorts of arguments, and then later on arguing equivalence against tromethamine, which was clearly not part of what the prosecution history estoppel would forfeit, and there isn't anything that would allow someone to understand that they couldn't engineer around pemetrexid in the way that Hasbira believed it had engineered around by going to a product, a salt, a form of ditromethamine. Can I ask you one quick question, and it may have a simple no answer? Do you happen to know from what source, whether it's an amicus brief or a prior precedent, the Supreme Court might have taken the tangential relation point in the Festo paragraph? I couldn't find it. I'm not aware of a case that does that, and there are only a few cases from this court that have done that. It is not litigated very often as far as I can tell, and I should save, I suppose, the time I have left for rebuttal. We will save you two minutes. Thank you. Mr. Perlman.  May it please the Court. I think I'll start with the doctrine of equivalence issue. That seems to be the focus. I'd like you to talk about the literal infringement. All right. Claim 12 recites pemetrexid disodium four times, and why is it not clear that using another salt does not literally infringe that claim? And there are two direct answers to that question, Your Honor. The first is the undisputed point that the claim covers the intravenous infusion of pemetrexid disodium in solution, and two, the unrebutted expert testimony that was before the district court that we have it from our oncologist and also from our pharmaceutical formulation slash chemist expert that said that in this art, the ordinary meaning of a solution of pemetrexid disodium, which is covered by the claim, would include disassociated pemetrexid and sodium. We're talking about administration of pemetrexid disodium. Correct. Which sounds like a specific compound. And that… That's aside from what it might turn into in solution as a cation with a bunch of anion with a bunch of sodium ions. Well, so that would certainly be covered by the claim. And the point that I am making is in its ordinary usage in this field, the phrase pemetrexid disodium, in the context of an administration phrase, is not so limited. We put in expert testimony as to the ordinary usage in the field, which the district court relied upon. Haspira had the opportunity to say, no, no, it's clear as day that that's wrong. And here's our expert. Here's our reference book. Here's our anything that says that's wrong. They didn't do any of that. And I don't think that this is a sort of unusual… Is it your view that if the claim says administration of pemetrexid disodium, that if the solution that's administered is not disodium but trisodium or quadsodium or what is that sodium, whatever other sodium it can be, that it's automatically covered? Yes, because when disassociated, there's at least two sodium items for every one pemetrexid. I don't know if I'm saying this right. But you understand my point. I understand exactly your point. And Dr. Chavner and Dr. Pranal both addressed this point directly in unrebutted expert testimony. And they said that… And look, we're the first to acknowledge this phrase is used in somewhat a colloquial or informal fashion in the field. But that's not unusual. When they gave that testimony, did they point to any writings? So using it or just their usage in their memory? They pointed to their own experience and usage in the field. So the answer is no. Correct. They didn't point to anything. They pointed to… I mean, they gave general background about acids and bases and salt. But, yes, that's a fair point. And if there were contrary references, you would expect Hospir to have put them in. I want to get back to… Just be clear. What we're talking about… Okay, I don't… When we're talking about literal infringement is whether administration of pemetrexid ditromethamine, that particular salt, is literally… literally infringes claim reciting pemetrexid disodium. I understand that. And the answer is that the unrebutted expert testimony is that the usage in the field is So when that is dissolved in saline, it would be considered administration of pemetrexid disodium. Now, there's no legal rule that says a solution can be labeled one thing and one thing only. If you want to call it a solution of pemetrexid ditromethamine, that's not inconsistent with it also being a solution of pemetrexid disodium as used in this patent claim. Would you go back to my question now? I was attempting to get back to answering it. Pemetrexid has a negative two charge. This is true when you start with solid pemetrexid disodium and dissolve it in saline or you start with something else and dissolve it in saline. Pemetrexid has a negative two charge when dissolved. And the testimony from Dr. Pinal, which is unrebutted, is that means it takes two positive charges to balance that pemetrexid. And so when scientists think about what you would call this relationship between the pemetrexid and the sodium, they would say that it's pemetrexid disodium because there are two positive charges to balance the two negative charges of the molecule. That is unrebutted in the record as to the usage in the field. Olympta, which starts as the solid salt, is dissolved in saline and is administered in the patient. And there is a vast excess of sodium because it's dissolved in saline. And it's common ground that that is covered by the claim. You wanted to start out on equivalence. Why don't you head for equivalence? I happily head for equivalence. And I think that much of what I have to say, the court has already said, but let me sort of hit the highlights. By the way, do you happen to know where this tangential relation phrase infesto might have come from? I do not. I don't have any basis to say that the justices of the Supreme Court didn't come up with it on their own. I simply don't know. So the issue before what you heard essentially is we said Pemetrex and disodium lots of times in the amendment, which is, of course, true because that was the claim language that we inserted. And in the tangentiality case, the patentee always inserts claim language that narrows the claim and excludes the accused equivalent. But that's not the inquiry under the tangentiality exception. The question is, what is the reason that the claim was narrowed? Here, the file history shows that the reason it was narrowed is because of the rejection over the Arsenian reference, which disclosed methotrexate, which is a different antifoliate. We narrowed down to specify that we were not covering all active antifoliates. We were covering Pemetrexate as the active antifoliate, and we claimed it in the disodium form. There are two facts in the intrinsic record that demonstrate that the designation of the salt is tangential to that amendment. The first is what Judge Moore pointed out. The discussion of the purpose of this invention is to reduce the toxicity of Pemetrexate disodium. And every skilled artisan knows and knew, and it's undisputed, Pemetrexate disodium has no toxicity. When the sodium and the Pemetrexate are bonded together, they don't do anything. They don't bond to an enzyme. They don't cause any toxicity. It is the Pemetrexate itself in dissociated form that causes the toxicity. The second point, and this gets lost a little bit, the specification in column four defines what it means by an antifoliate. And the definition that it gives is the compound that interacts with the folate requiring enzymes and has various effects. That is Pemetrexate. That would be understood in the art to be Pemetrexate. If you didn't have that in the specification, the analysis would be the same. But combined with the reference itself that was a rejection, the discussion of the toxicity, and the definition of antifoliate, the district court was correct in holding that the reason for the amendment was tangential to the claimed equivalent. Is extra analysis required for the amendment to claim five for which that particular piece of prior art, if I'm remembering right, doesn't appear in your explanation? I don't think there's any extra analysis required because I think you can't look at claim five with blinders on, which is what I think Hasbir is asking you to do. The same phrase, antifoliate, was narrowed to the same phrase, Pemetrexate disodium, at the same time in all the claims when Lilly responded to the rejection over Arsenium. As the district court found, from the face of the file history, the Arsenium issue is the reason for the amendment. And if you ask yourself, well, how do we know there isn't some different reason for claim five? One of the references in claim five discloses Pemetrexate disodium. So amending to Pemetrexate disodium couldn't be to address that set of rejections. The other point I'll point out is if you look in the file history at the page that Judge Moore was talking about. And which is the reference? There's one that begins with John and not the other. Omori is the vitamin. John is the Pemetrexate disodium. If you look at the page discussing the response to the anticipation rejection, Lilly argues that in light of the amendments, the claims are not anticipated. When it comes to obvious, Lilly doesn't rely on the claim amendments to respond to any of those rejections. It argues the merits of the references about whether you would expect to reduce toxicity, which is further confirmation that the amendment was due to what, of course, it was due to, the Arsenium rejection under 102. The final thing I will say here is the patent makes clear that the issue is the active antifoliate. The discussion of toxicity in the file history makes clear that the issue is the active antifoliate. And the real world that we're all living in makes clear that the issue is the active antifoliate. The only reason we're here is because Hospira and DRL are using Lilly's clinical data and Lilly's clinical trials with Pemetrexate disodium to say that different salts of Pemetrexate will be the same thing when you sell them to treat cancer. They have a paper NDA, not an AMDA? Paper NDA, yes. You suggested that the amendment was only mentioned with regard to anticipation and the Arsenium reference. Respectfully, that's not correct. It's mentioned with regard to obviousness on 47880. That's when you again say the combination would reduce the toxicity associated with the administration from the Tetrax disodium. You use the exact same language between both paragraphs. I apologize, I'm in the different appendix. It's the same page. Show me on the page, Mark. Alone or in combination with John? I'm not seeing the part that you're reading. Clearly we recite the phrase Pemetrexate disodium. I didn't mean to. No, you recite the phrase reducing the toxicity associated with Pemetrexate disodium. That is the exact same language you contain in the explanation with regard to the 102 reference. That is 100% correct. If you want me to look at that language for anticipation and credit it, then the same applies for the obvious. I think I was not articulating my point well enough, Your Honor, so I appreciate the chance to clarify it. All of the rejections discuss the toxicity associated with Pemetrexate disodium, and the skilled artisan would know that that's about Pemetrexate itself. The language I was talking about was in the second-to-last line of the anticipation rejection where it says, in view of the present amendments and the comments above, applicants respectfully request withdrawal of this rejection. And there is no such reliance of, in view of the amendments, we now believe we are patentable in the obviousness rejection. That's the only point I was making. I was not making it. I don't understand because the amendment itself is to add the word Pemetrexate disodium, and you refer to the word in the obviousness rejection. So the fact that you don't call it the amendment, instead just use the name of the word that you amended with. It's not a critical point, Your Honor. I take your point. I think I'm making a slightly different one. But I take your point that even if we are relying on Pemetrexate disodium in the obviousness section, the association of the vitamins to reduce the toxicity of Pemetrexate disodium is related to Pemetrexate itself. It's the same rationale. My clerk just clarified it for me. He did a better job than you did. The obvious rejection is different. The prior art disclosed Pemetrexate disodium. That's why they referred to it. That might have been a better answer. Okay. I appreciate that, Your Honor. If I could get a screen, I could probably do it faster. Well, especially if you had my clerk feeding you the answer. I'm happy to take all the assistance that the court would allow. If there are no other questions, I'll reserve. Well, I don't reserve. I'll be done. You won't reserve. I won't reserve, but I will see you again shortly. We'll see you soon. Thank you, Mr. Perlman. And Mr. Malayula has two minutes for rebuttal. Thank you, Your Honor. If I may, let me go back to literal infringement. Where I think the district court went wrong is in failing to give the claim term its ordinary meaning. And that led it to read into the claim term a lot of information and a lot of what turned out to be what I believe argument concerning, well, let me say it this way. The claim term has a plain meaning. And the plain meaning is to dispense or apply Pemetrexid disodium to a patient. That's all it means. The claim term is neutral with respect to, in fact, the entire claim, Claim 12 is a good one to look at, is neutral with respect to route of administration. It mentions, for example, vitamin B. We know from reading the patent, vitamin B can be injected through an intermuscular injection. It mentions folic acid. We know from reading the patent that folic acid can be administered orally. And then it mentions Pemetrexid disodium. It doesn't mention any particular route of administration. The claim is neutral. It uses the word administration neutrally in discussing and avoiding any discussion of route of administration. So what the claim term means is giving, and it's as simple as this, it means giving a patient Pemetrexid disodium. Full stop. That's what it means. And so if that's what the claims mean, and I believe that is the correct meaning, if that's what the claims mean, then Hospirin does not infringe. Because Hospirin never gives anyone Pemetrexid disodium. Disodium never exists if you use the Pemetrexid product. And so there's a very simple response on the infringement question in view of the misconstruction of that particular claim term. I think I've used up all my time. I won't respond further on the doctrine of equivalence. I expect the speaker to come, will cover that very thoroughly, and I know entrust the court with the question. Thank you very much. Thank you, counsel. We will take that case under advisement.